**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| R Jason Loyd, et al., | No. CV-22-02065-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| McKesson Corporation, et al., | |
| Defendants. | |

Defendants McKesson Corporation and McKesson Medical-Surgical Inc. (collectively, "McKesson") operate together as a global healthcare supply retailer. Plaintiffs R Jason Loyd, Troy Sloneker, and Dianna Wynn are all former employees of McKesson. When McKesson implemented a policy requiring employees to obtain a COVID-19 vaccination ("Vaccination Protocol"), Plaintiffs each requested a religious exemption from vaccination. McKesson denied the requests and later terminated Plaintiffs, pursuant to the Vaccination Protocol. Plaintiffs claim that, in so doing, McKesson discriminated against them in violation of Title VII of the Civil Rights Act of 1964 and the Arizona Civil Rights Act ("ACRA"). Pending before the Court is McKesson's motion for summary judgment. (Doc. 96.) The motion is fully briefed.[1] (Docs. 104, 106.) For the

---

[1] Oral argument is denied because the motions are adequately briefed, and oral argument will not help the Court resolve the issues presented. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

following reasons, the Court grants in part and denies in part the motion for summary judgment.

## I. Background

McKesson employed Plaintiffs as Account Managers. (Doc. 1 ¶ 16.) Plaintiffs each sold medical products and services to healthcare providers within an assigned geographic territory. (Doc. 96-2 at 9, 32; Doc. 96-4 at 45.) Plaintiffs have been with McKesson for over twenty years each. (Doc. 1 ¶ 17.) The nature of their work has always been hybrid, requiring both in-person meetings with customers and remote work at their home offices. Loyd estimates that he spends ten to twenty percent of his time in person with customers and prospective customers. (Doc. 96-2 at 12–14.) Sloneker estimates that he splits his time evenly between remote and in-person work. (*Id.* at 34.) Wynn stated that she works from home and is not in an office environment on a day-to-day basis. (Doc. 96-6 at 43.) They all attended annual regional and national sales conferences in person. (Doc. 96-2 at 3; Doc. 104-1 at 144.)

When the COVID-19 pandemic struck, McKesson required its employees to work remotely and prohibited in-person work and client visits. (Doc. 96-5 at 52–53.) But McKesson's approach to its pandemic policy evolved as new information about COVID-19 became available. In 2021, it began permitting in-person meetings with prior customer approval. (Doc. 96-2 at 16, 38.) Later that year, McKesson implemented the Vaccination Protocol. (Doc. 96-5 at 93–99.) The Vaccination Protocol provided that "[e]mployees who enter professional health care settings as part of their role, including . . . sales professionals" were to be fully vaccinated by November 15, 2021. (*Id.* at 93.) It further provided that covered employees could apply for exemption from the vaccination requirement based on sincerely held religious beliefs. (*Id.* at 96.) Upon receipt of a religious accommodation request, McKesson stated that it would engage in the "interactive process" to determine whether an employee could be accommodated or whether accommodation would impose an undue hardship. (*Id.*) Covered, non-exempt employees who failed to provide proof of vaccination by November 15, 2021 would be placed on unpaid

administrative leave for six weeks to give them time to provide proof of full vaccination. (*Id.* at 94.) If such an employee did not get vaccinated during that time, McKesson would terminate their employment. (*Id.*)

Plaintiffs each submitted requests, wherein they certified that they had sincerely held religious beliefs. (Docs. 96-5 at 143; 96-6 at 21, 31.) Each of them indicated that receiving the COVID-19 vaccination would conflict with their religious beliefs. (Docs. 96-5 at 142; 96-6 at 22, 31.) In total, sixty-three employees requested religious accommodations to the Vaccination Protocol; twenty-four or twenty-five of them held positions like Plaintiffs'. (Doc. 104-1 at 37–38.) As part of McKesson's "interactive process," religious accommodation seekers, including Plaintiffs, met with third-party human resources ("HR") consultants tasked with interviewing those requesting accommodations and assessing the propriety of such requests. (Doc. 96-3 at 3.) The HR consultants recorded accommodation seekers' answers to various questions about the nature of their religious beliefs. (*Id.* at 3–4.) They then supplied this information to McKesson's Employee Relations team. (*Id.* at 4.)

On its end, McKesson and its attorneys identified several "Key Considerations" regarding accommodation requests for Account Managers. (Doc. 96-6 at 55.) These considerations included the potential damage to McKesson's reputation; McKesson's moral obligation to minimize possible COVID-19 exposure to its employees; McKesson's customers' vaccination requirements; the difficulty in swapping customers among sales representatives without "negative impact"; the need for in-person customer interaction; potential lost business and an inability to remain competitive. (*Id.*) Given these considerations, McKesson believed it would suffer "more than a *de minimis* loss in sales revenues," and it recommended denying all Account Managers' requests for accommodations. (*Id.*) McKesson's Employee Relations teams reviewed all the information and provided the recommendations on accommodations to Brad Hilton, Senior Vice President of Primary Care Sales. (Doc. 96-3 at 4.)

Hilton met with several other McKesson executives to discuss the religious

accommodation requests. (Doc. 96-5 at 7–8.) Hilton admits that he was the final decisionmaker regarding Plaintiffs' accommodation requests. (*Id.* at 8–9.) Hilton and the other executives assumed the accommodations would have to be made "forever." (Doc. 104-1 at 145.) They discussed the possibility of swapping accounts amongst Account Managers, moving Plaintiffs to "inside sales," or using other precautionary measures for unvaccinated Account Managers like masking and testing. (Doc. 96-5 at 11.) Hilton explained that customer positions and policies were changing, making any possible accommodation more challenging. (*Id.* at 13.) Hilton and the other executives decided they "would not be able to service [McKesson's] customers long term and remain competitive without face-to-face sales representation," so they ultimately decided to deny Plaintiffs' accommodation requests. (*Id.* at 9.) In fact, McKesson initially denied all sixty-three accommodation seekers' requests. (Doc. 104-1 at 40.) But, because of "changes in the law," eventually six Account Managers were granted an accommodation. (*Id.* at 39–40.)

In early November 2021, McKesson notified Plaintiffs that their requests were denied and placed Plaintiffs on unpaid administrative leave for six weeks in accordance with the Vaccination Protocol. (*Id.* at 159; Doc. 96-2 at 22.) Plaintiffs did not obtain vaccinations by the deadline, and they were terminated. (Docs. 96-2 at 6, 52; 96-5 at 42–43.) In response to their terminations, Plaintiff brought this lawsuit. Plaintiffs allege identical claims under Title VII and ACRA: discrimination and retaliation. (Doc. 1 at 6–9.) They advance both a disparate treatment and disparate impact theory of religious discrimination. (Doc. 104 at 5, 20.) McKesson moves for summary judgment on all claims.

**II.     Legal Standard**

Summary judgment is proper if there is no genuine dispute of material fact, and viewing the facts in a light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th

Cir. 2002). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id.* at 324. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation and citation omitted). Even where there are some factual issues raised, summary judgment is appropriate if the totality of the undisputed facts is such that reasonable minds could not differ on the resolution of the factual question. *Chesney v. United States*, 632 F. Supp. 867, 869 (D. Ariz. 1985).

**III.   Analysis**

Title VII and ACRA prohibit discharging an employee because of the employee's religion. 42 U.S.C. § 2000e-2(a)(1); Ariz. Rev. Stat. Ann. ("A.R.S.") § 41-1463(B)(1). "Religion" under Title VII is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j); *see also Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1222 (9th Cir. 2023). Title VII and ACRA also prohibit the employer from retaliating in response to an employee engaging in a protected activity. 42 U.S.C. § 2000e-3(a); A.R.S. § 41-1464. "The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . claims on summary judgment is minimal and does not even rise to the level of preponderance of the evidence."

*Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). The plaintiff need only provide evidence that "gives rise to an inference of unlawful discrimination." *Lowe v. City of Monrovia*, 775 F.2d 998, 1005 (9th Cir. 1985) (quotation and citation omitted).

Plaintiff advances two theories of liability for religious discrimination: (1) discrimination by failure to accommodate and (2) disparate-impact discrimination. They also bring a retaliation claim.[2] (Doc. 104 at 5, 20.) McKesson moves for summary judgment on all claims. The Court addresses each in turn.

### a. There are genuine disputes of fact precluding summary judgment on Plaintiffs' failure-to-accommodate claims.

Plaintiffs first advance a failure-to-accommodate theory of religious discrimination.[3] To succeed on such a claim, a plaintiff must set forth a prima face case that "(1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004) (citing *Heller v. EBB Auto. Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993)). If a plaintiff makes a prima facie case, the burden shifts to the defendant to show that it "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998). McKesson believes it is entitled to summary judgment on the failure-to-accommodate theory because Plaintiffs cannot show that they hold bona fide religious beliefs. Alternatively, McKesson raises the affirmative defense of undue hardship in accommodating Plaintiffs.

---

[2] Because ACRA and Title VII are "generally identical" and "federal Title VII case law is persuasive" in interpreting ACRA, the Court deals with the corresponding ACRA and Title VII claims together throughout its analysis. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004) (quoting *Higdon v. Evergreen Int'l Airlines*, 673 P.2d 907, 909–10, n.3 (1983)).

[3] A failure-to-accommodate theory of religious discrimination is a species of disparate treatment claim. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 787–88 (2015) (Thomas, J., concurring).

### i. There are genuine disputes of fact regarding Plaintiffs' religious beliefs that preclude summary judgment.

A religious belief need not be consistent or rational to be protected; it need only be sincerely held. *Keene v. City and Cnty. of San Francisco*, No. 22-16567, 2023 WL 3451687, at *2 (9th Cir. 2023); *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992). Purely social, political, and economic philosophies and personal preferences are not religious beliefs, but overlap between such philosophies and preferences and religious beliefs does not place the belief outside the scope of Title VII's protections. EEOC Compliance Manual § 12-I(A)(1) (Jan. 15, 2021).[4] And a "religious practice" is not limited to "those practices which are mandated or prohibited by the tenet of the religion[.]" *Heller*, 8 F.3d at 1438 (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 900 (7th Cir. 1978)). Indeed, it is not the province of the courts to say what a religious practice or activity is. *See Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).

McKesson argues that Plaintiffs' beliefs are not sincerely held based on Plaintiffs' deposition testimonies. (Doc. 96 at 8.) It is undisputed that each plaintiff's accommodation request form included a religious justification for the request and that each plaintiff "certified" his or her sincerely held belief on the form. (*See* Doc. 104-1 at 264, 344, 429.) McKesson's objection is that Plaintiffs' admissions during their depositions revealed that their ostensibly religious objections were insincere and pretextual.

McKesson supports its arguments with authority from courts in the Third Circuit, which employs the *Africa* test for bona fide beliefs. (*See, e.g.*, Docs. 96 at 15 (citing *Fallon v. Mercy Cath. Med. Ctr. of Se. Penn*, 877 F.3d 487 (3d Cir. 2017)); 106 at 3 (citing *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458 (M.D. Pa. 2022); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022)).) The *Africa* test notably allows for significant scrutiny into the legitimacy of a religious belief

---

[4] "Although EEOC Guidelines are not binding on the courts, they 'constitute a body of experience and informed judgment which courts and litigants may properly resort to for guidance.'" *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986)).

- 7 -

system.[5] The Ninth Circuit has never adopted the test, and indeed, has been much more cautious in its approach to scrutinizing the validity of religious beliefs.[6] The Ninth Circuit has emphasized that Title VII's protection of religious observances and practices is expansive. *Heller*, 8 F.3d at 1438. The Court declines to transgress precedent and adopt the *Africa* test or the reasoning of decisions employing it.

The Court is instead persuaded by the Seventh Circuit's understanding of the relationship between personal and religious beliefs. In *Passarella v. Aspirus, Inc.*, the court declined to draw a distinction between requests for accommodations based "primarily" on religion and requests based only "minimally" on religion. 108 F.4th 1005, 1010 (7th Cir. 2024). Such "distinctions would prove slippery in practice and arbitrary in their application." *Id.* In other words, though a plaintiff's belief may be rooted in religion *and* social, political, economic, or personal convictions, the belief is nonetheless religious. With that understanding in mind, the Court finds that there is a genuine dispute of material fact as to whether Plaintiffs harbor sincerely held religious objections to the COVID-19 vaccination that preclude summary judgment.

### 1. Loyd

Loyd attached a letter to his request form describing his beliefs. Loyd believed himself exempt "based on [his] deeply held religious beliefs as a follower of my Lord and Savior Jesus Christ[.]" (Doc. 96-5 at 142.) He quoted several passages from the Bible and

---

[5] The Third Circuit

> has determined that, in evaluating whether a belief can be termed "religious," as opposed to an "isolated moral teaching" or a philosophical belief, a judge must determine whether it "addresses fundamental and ultimate questions having to do with deep and imponderable matters," whether it is "comprehensive in nature," and whether it is accompanied by "certain formal and external signs."

*Ulrich v. Lancaster Gen. Health*, No. 22-4945, 2023 WL 2939585, at *4 (E.D. Pa. Apr. 13, 2023) (quoting *Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981)).
[6] Similarly, cases from other Circuits that McKesson offers where trial courts scrutinized religious beliefs about the COVID-19 vaccine have since been overturned at the appellate level. *See, e.g.*, *Thornton v. Ipsen Biopharms., Inc.*, No. 23-11171-JCB, 2023 WL 7116739 (D. Mass. Oct. 26, 2023), *aff'd in part, rev'd in part*, No. 23-1951, 2023 WL 211517 (1st Cir. Jan. 16, 2025); *Passarella v. Aspirus, Inc.*, No. 22-cv-287-jdp, 2023 WL 2455681 (W.D. Wis. Mar. 10, 2023); *rev'd & remanded*, 108 F.4th 1005 (7th Cir. 2024).

expressed his belief that "God speaks to [him] through study of the Holy Bible and through the Holy Spirit who lives in [him]." (*Id.*) He believes that his body is "God's temple," and thus he is "commanded to take good care of my body, not defile it, and certainly not introduce something into it that could potentially harm it." (*Id.*) His letter also indicated his belief that abortion is murder, and injection of vaccines developed or tested using "fetal stem cell lines from aborted babies" would go against his religious beliefs. (*Id.*) Loyd testified that he believed mRNA vaccines, including COVID-19 vaccines, would alter his DNA. (Doc. 96-2 at 48–49.) Consistent with his accommodation request, he further testified that he did not want to take something that was initially developed or tested using fetal stem cells because he believes abortion is murder. (*Id.* at 21–22.)

McKesson cites its expert report, which explains the nature of fetal stem cell use in the development and testing of COVID-19 vaccines. The expert report acknowledges that fetal cell line HEK 293 "was used during the research phase for 'proof of concept' studies" and that "[c]ells taken from two abortions in the 1960s were replicated in a laboratory to produce two cell lines" that can be used repeatedly. (Doc. 96-7 at 16.) The expert thus explained that the vaccine was not developed from aborted fetal cells. (*Id.*) The expert adds that Loyd admitted to taking other medications that were developed the same way. (*Id.*) McKesson thus asserts that Loyd's belief is insincere or does not conflict with the vaccination requirement.

### 2. Sloneker

Sloneker's request stated that "God created [him] with an immune system[,] and [he] will not alter [God's] design." (Doc. 96-6 at 22.) Sloneker later testified that his "concern with the religion is the gene therapy aspect of the COVID vaccines" because he believed that "gene therapy" would alter his immune system. (Doc. 96-2 at 48, 50.) McKesson disputes that his belief can be sincerely held because his concern with COVID-19 vaccines being "gene therapy" is a medical judgment, not a religious belief. (Doc. 96 at 18.)

### 3. Wynn

In Wynn's accommodation request, she explained that "[t]he Bible teaches [her] that the body is created in the image of God, the temple of the Holy Spirit, a living sacrifice to the Lord." (*Id.* at 31.) Thus "[d]oing anything to alter God's design" of her immune system would conflict with her religious beliefs. (*Id.*) Wynn later testified that she does not believe "vaccines are safe or effective," and they "have a lot of things in them I'm morally objective [sic] to." (Doc. 96-5 at 38.) She testified that she "felt like [her] son was injured by a vaccine when he was younger," which prompted her to do research into vaccines and vaccine companies. (*Id.* at 31.) She now believes "there's no legal liability for vaccine companies," so companies have no incentive to make them safe. (*Id.*) She added that she does not believe in vaccines. (*Id.* at 39.) McKesson argues that Wynn's deposition testimony reveals her objections to the vaccine are not religious.

### 4. Decision as to All Plaintiffs

In each instance, McKesson asks the Court to weigh evidence and make credibility determinations. That Plaintiffs' initial accommodation requests and later deposition testimonies may conflict does not prove, as a matter of law, that their religious beliefs are insincere. *See Thomas*, 450 U.S. at 714 ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."). And the fact that Plaintiffs' depositions may indicate that their beliefs about COVID-19 vaccines were not *entirely* religious does not mean their beliefs were not religious *at all*. The issues McKesson raises are properly for the trier of fact.

### ii. McKesson fails to demonstrate that it is entitled to judgment as a matter of law on its undue hardship defense.

If an employee can make out a prima facie case of religious discrimination, the employer can still avoid liability if it can show that accommodating the employee would have imposed an undue hardship. *Heller*, 8 F.3d at 1440. "Undue hardship is an affirmative defense[.]" *Bolden-Hardge*, 63 F.4th at 1224. Historically, anything more than a "de minimis cost" was considered an "undue hardship." But in 2023, the Supreme Court

clarified that the "de minimis cost" test is incorrect. *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). Instead, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.*

Whether an accommodation imposes an undue hardship depends on "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Id.* (internal quotation marks omitted). Employers cannot consider non-economic costs to coworkers that are based on employee animosity towards a religion. *Id.* Moreover, "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations." *Id.* at 473.

McKesson asserts that "[t]he nature of Plaintiffs' job required in-person contact with customers to maintain robust relationships, to develop new clients, and to maintain McKesson's advantage in the marketplace." (Doc. 96 at 22.) Thus, it concluded that it could not allow Plaintiffs to work completely remotely indefinitely, and it had to consider other options to accommodate Plaintiffs' religious beliefs. Specifically, McKesson considered whether swapping accounts would be a feasible accommodation, but it concluded that doing so would be "administratively burdensome" and would "significantly impact their peers (who were paid on commissions), by requiring them to take on new customer accounts and give up existing accounts[.]" (Doc. 96 at 10.)

EEOC Guidelines counsel that the administrative costs are not unduly burdensome, so the Court does not consider those in its assessment. *See Groff*, 600 U.S. at 466 (The EEOC "has specifically cautioned . . . against extending the phrase to cover such things as the 'administrative costs' in reworking schedules[.]"). The effect of the accommodation on Plaintiffs' colleagues, however, could impose an undue hardship. But the record does not compel that conclusion that it did. In fact, it is not clear that account swapping would have been necessary.

When deposed, McKesson admitted that it does swap accounts amongst sales representatives in the ordinary course of business (and indeed, upon customer request). (Doc 104-1 at 167–68, 247–48.) It further admitted that no one consulted any of Plaintiffs' customers to determine whether those customers would continue working with Plaintiffs despite their vaccination status. (*Id.* at 154.) McKesson did not know whether any of Plaintiffs' customers had a vaccination requirement themselves, nor could Hilton recall which of McKesson's customers were demanding to return to face-to-face meetings. (*Id.* at 161.) McKesson admitted that even vaccinated Account Managers were not required to visit customers in person, cutting against the claim that in-person contact was necessary. (*Id.* at 216.)

Moreover, there is no evidence that McKesson asked other Account Managers whether they would voluntarily swap accounts, which is generally considered an accommodation that can be achieved without undue hardship. *See* 29 C.F.R. § 1605.2(d)(1)(i); *see also Groff*, 600 U.S. at 473 (holding that consideration of voluntary shift swapping is necessary in certain circumstances). Loyd and Sloneker's direct supervisor testified that account managers appreciated receiving additional, new accounts and suggested that voluntary offers of new business were received positively. (Doc. 104-1 at 248.)

There is a question of fact as to whether McKesson "reasonably accommodate[d]" Plaintiffs' practice of religion or whether it "assess[ed] the reasonableness of a particular possible accommodation or accommodations." *Groff*, 600 U.S. at 473. McKesson has not demonstrated that it is entitled to summary judgment on the ground that accommodating Plaintiffs would have resulted in an undue hardship.

> **b. McKesson is entitled to summary judgment on Plaintiffs' disparate impact claims because Plaintiffs fail to make a prima facie case.**

Plaintiffs also advance a disparate impact theory of religious discrimination. To succeed on a disparate impact claim, a plaintiff must demonstrate "that a facially neutral employment practice has a significantly discriminatory impact upon a group protected by

Title VII." *Paige v. California*, 291 F.3d 1141, 144 (9th Cir. 2002). Plaintiffs fail to demonstrate that the policy had a significantly discriminatory impact on a group protected by Title VII. McKesson and Plaintiffs basically agree that the "group" here is those employees who sought a religious accommodation to the Vaccination Protocol. (*See* Docs. 96 at 23; 104 at 21–22.) A particular religious group is a protected class. The group of accommodation seekers (albeit seeking an accommodation for religious reasons) is not.

Even assuming that the group of accommodation seekers were members of a single religious group, Plaintiffs provide no statistical evidence demonstrating disparate impact. "Statistical evidence is used to demonstrate how a particular employment practice causes a protected minority group to be under represented in a specific area of employment (for example, hiring or promotion)." *Id.* "Statistical evidence must be sufficient to show that the questioned practice caused the [disparate impact] because of membership in a protected class. The statistical disparities must be sufficiently substantial to raise an inference of causation." *Tucker v. Reno*, 205 F. Supp. 2d 1169, 1174 (D. Or. 2002). "Summary judgment is appropriate when statistics do not support a disparate impact analysis." *Pottenger v. Potlach Corp.*, 329 F.3d 740, 749 (9th Cir. 2003).

Here, Plaintiffs' attorney merely included several calculations in his brief that he asserts demonstrate a statistical significance. Though Rule 56 requires only that the substance of the proffered evidence be admissible, the burden is on the proponent of that evidence to show that it can be presented at trial in a way that would be admissible. Fed. R. Civ. P. 56(c)(2); *see Enriquez v. Gemini Motor Transp. LP*, No. CV-19-04759-PHX-GMS, 2021 WL 5908208, at *3 (D. Ariz. Dec. 14, 2021). Plaintiffs' attorney cannot testify. Ariz. R. Sup. Ct. ER 3.7. Plaintiffs have not certified an expert to offer statistical evidence, nor have they attempted to provide any information on how the statistical data could be offered in a way that would be admissible at trial. *See* Fed. R. Evid. 702. An attorney's calculations based on an improper sample are not *evidence* demonstrating a disparate impact.

Because Plaintiffs fail to make a prima facie showing of disparate impact, the Court

need not consider whether McKesson has established a business necessity defense. The Court grants McKesson summary judgment on Plaintiffs' disparate impact claims.

### c. Retaliation

To make a prima facie case for Title VII retaliation, a plaintiff must establish that (1) he or she engaged in protected activity; (2) the employer subjected them to an adverse employment action; and (3) the plaintiff's protected activity caused the adverse employment action. *Ray v Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). If the plaintiff makes a prima facie case, the defendant may rebut it by articulating a legitimate, non-retaliatory motive for the action. *Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 1002 (9th Cir. 2019). The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason was a pretext for retaliation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

Plaintiffs have not made out a prima facie case of retaliation. Though they engaged in a protected activity when they made their accommodation requests, they have not raised a genuine dispute as to whether they were terminated *because* of their requests. As McKesson points out, its Vaccination Protocol was put in place *before* Plaintiffs requested accommodations, and Plaintiffs were terminated purely for their failure to comply with it. (Doc. 96 at 24.) There is thus no causal connection between the protected activity (making accommodation requests) and the termination. This decision is in line with other courts in the Ninth Circuit. *See, e.g.*, *Lundstrom v. Contra Costa Health Servs.*, No. 22-cv-06227, 2022 WL 17330842, at *6 (N.D. Cal. Nov. 29, 2022); *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1311 (D. Haw. 2022).

### IV. Conclusion

For the foregoing reasons, the Court grants summary judgment in McKesson's favor on the disparate impact and retaliation claims. Plaintiffs may proceed on their failure-to-accommodate claims.

**IT IS ORDERED** that McKesson's motion for summary judgment (Doc. 96) is **GRANTED** in part and **DENIED** in part as stated herein.

1   **IT IS FURTHER ORDERED** that the parties shall appear for a telephonic trial scheduling conference on **March 25, 2025, at 9:30 a.m**. Call-in instructions will be provided to the parties via separate email.

Dated this 20th day of February, 2025.

_____
Douglas L. Rayes
Senior United States District Judge